**UNITED STATES DISTRICT COURT**

**DISTRICT OF CONNECTICUT**

OCT 18 2022 PM 1:26
FILED - USDC - BPT - CT

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION THAT IS STORED WITH A CELLULAR TELEPHONE ASSIGNED TELEPHONE # 475-449-7160 | Case No. 3:22 mj 922 (SDV) <br><br> **Filed Under Seal** <br><br> October   , 2022 |

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Michael Oppenheim, a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives, having been duly sworn, state:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search and seizure warrant to forensically search and seize information from the cellular device assigned 475-449-7160 with service provided by T-Mobile and used by Jameyah Carmichael ("the **Target Telephone**") from April 5, 2021 until the present.[1]  For reasons described more fully below, there is probable cause to believe that the **Target Telephone** contains evidence of violations of Title 18, United States Code, Section 1962(d) (Racketeering Conspiracy); Title 18, United States Code, Section 1959 (Violent Crimes in Aid of Racketeering); Title 18, United States Code, Section 922(g) (Possession of a Firearm by a Prohibited Person); Title 18, United States Code, Section 924(c) (Possession of a Firearm in Furtherance of Drug Trafficking); and Title 21, United States Code, Sections 841(a)(1) and 846 (Distribution and Possession with Intent to Distribute Narcotics and Conspiracy to Possess with Intent to Distribute and to Distribute Narcotics) (the "**Target Offenses**"). Based

---

[1] As discussed below, this is the date that known Exit 8 gang member JAEYDEN RIVERA is released from custody and begins engaging in criminal activity and likely communicating with Carmichael.

on the facts set forth in this affidavit, I believe there is probable cause to search the information described in Attachment A (the Target Telephone) for evidence of the Target Offenses as further described in Attachment B for the limited time period set forth above.

2.      I am a regularly appointed Special Agent of the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) and have been since 2001.  As such, I am a law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18 of the United States Code, that is, an officer empowered by law to conduct investigations of, and make arrests for, offenses enumerated in Section 2516 of Title 18.

3.      Prior to the ATF, I was employed by the United States District Court for the Southern District of New York as a United States Probation Officer. I am a graduate of the Criminal Investigator Training Program and the ATF Special Agent Basic Training program, both of which are conducted at the Federal Law Enforcement Training Center in Glynn County, Georgia.  The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.      I have received specialized training in firearms identification and the investigation of firearms-related offenses. I have participated in investigations involving the unlawful possession of firearms by prohibited persons, including persons who are previously convicted felons; the possession of firearms in furtherance of the distribution of narcotics; and the use of firearms in the commission of violent acts.  I have participated in investigations involving individuals who unlawfully possess firearms, of individuals illegally selling firearms, and of individuals distributing illegal drugs. As such, I have coordinated the controlled purchases of

2

illegal narcotics and participated in controlled purchases of firearms utilizing confidential sources, cooperating witnesses and undercover law enforcement officers; written, obtained and coordinated the execution of search and arrest warrants pertaining to individuals involved in the illegal possession and distribution of firearms and narcotics; conducted electronic and physical surveillance of individuals involved in illegal drug distribution; analyzed records documenting the purchase and sale of firearms and illegal drugs; provided testimony, both in Grand Jury proceedings and District Court proceedings; and spoken with informants and subjects, as well as local, state and federal law enforcement officers, regarding the manner in which individuals obtain, finance, store, manufacture, transport, and distribute their illegal firearms and drugs. In addition, I have been involved in the investigation of street gangs, including gangs with a national presence as well as locally based gangs. I have received training, both formal and on-the-job, in the provisions of the federal firearms and narcotics laws administered under Titles 18, 21 and 26 of the United States Code.

5.     This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

6.     I am currently investigating SAMUEL DOUGLAS, JAEDYN RIVERA, TYJON PRESTON, QUAYMAR SUGGS, DEVIN SUGGS, CHARLES PHILLIPS, KIVEON HYMAN, VINCENT CLARK, HECTOR DELGADO, PHILLIP MOYE, JA'SEAN STEVENSON, DONNELL ALLICK, and others for the aforementioned Target Offenses. Carmichael is currently dating JAEDYN RIVERA. I am not currently sure of the extent of the direct involvement of Jameyah Carmichael in the Target Offenses. But, as set forth below, I know that she is in regular contact with these aforementioned individuals, discusses their criminal activity with them, and that

her discussions with them provide evidence of their commission of the Target Offenses. I thus have probable cause to believe that her telephone will contain evidence of the Target Offenses.

7.      I have participated in this investigation and, as a result of my participation and information received from other law enforcement officers, I am thoroughly familiar with the circumstances of the investigation and the information set forth in this affidavit. The statements contained in this affidavit are based on: (1) my personal participation in the investigation; (2) information provided to me by Special Agents and Task Force Officers of the ATF, (3) members of the FBI New Haven, DEA New Haven District Office, and New Haven Police Department (4) and my experience and training. Unless otherwise indicated, all conversations and statements described in this affidavit are related in substance and part.

8.      Because this affidavit is submitted for the limited purpose of establishing probable cause for the requested search warrant, it does not include all information gathered to date by the ATF and other law enforcement entities in relation to this investigation.

## **PROBABLE CAUSE**

9.      The Exit 8 gang is a local street gang named after the geographic area accessed by exiting Interstate 91 at Exit 8 in New Haven, Connecticut. Members of this gang typically reside in, or have previously resided in, this geographic area, which is often referred to as "the 8." The area of Exit 8 includes several small housing projects off the Route 80 corridor, which are located on two major thoroughfares, Eastern Street and Quinnipiac Avenue. In recent years, this area has been riddled with shootings, murders, shots-fired incidents, and violent crimes. Members of Exit 8 have long-standing issues with other neighborhood gangs within the city, specifically gang members from the Hill section of New Haven, dating back to 2014 and 2015, although violence has increased in recent years. Violence between these groups is retaliatory in nature, and members

of Exit 8 are believed to be responsible for a number of nonfatal and fatal shootings in the Hill section of New Haven.  Exit 8 has also been involved in a gang dispute with individuals associated with the "G," known to investigators as the former Farnum Courts Housing Complex located in New Haven.

10.     Members of the Exit 8 group/gang identify themselves by the numbers "8" and "88," and they often utilize the symbol of an eight ball.  These symbols are found in social media posts, on clothing, and in group members' tattoos, and they are used to show allegiance to the group/gang.  More recently, younger members of Exit 8 are identifying themselves with the word "Honcho."  This derives from the nickname of Dashown "Honcho" Myers (YOB 2001), an Exit 8 member who was murdered on February 23, 2020, on Quinnipiac Avenue and who has been glorified posthumously by the group.  This younger sect of the Exit 8 gang, which refers to itself as the "Honcho Gang," is involved in firearms violence and the theft of motor vehicles.

11.     The below is a map providing a rough depiction of the territory controlled by the Exit 8 gang.



12.     Based on the investigation conducted to date, including but not limited to arrests of and seizures made from gang members and associates; debriefings of arrestees, confidential informants, cooperating defendants, and cooperating witnesses; examination of information derived from cellphone extractions; and the review of social media, the investigation has revealed that Exit 8 members have been involved in violence involving other rival gangs and that they often shoot at/kill rival gang members.

13.     Amongst members of Exit 8, rival gang members are referred to as the "Opps" or "opposition." Social media platforms—including Facebook, Snapchat, and Instagram—are used by gang members on both sides to post pictures of themselves with narcotics, to promote their gang, threaten rival gang members, incite violence, to celebrate acts of violence, reveal or intimidate potential cooperators/witnesses, and to post pictures and videos of themselves posing with firearms. Social media platforms are also used to coordinate narcotics sales, to sell and trade firearms, and to plan and coordinate acts of violence. Shootings and murders raise the status of an individual gang member within the group and further his reputation within the gang.

14.     Law enforcement has identified a number of shootings in New Haven that are believed to be attributable to the Exit 8 gang, based on information gathered to date including National Integrated Ballistic Information Network (NIBIN) information regarding a Ruger LCP .380 firearm recovered on May 21, 2021, from RIVERA. The affiant and other case agents are investigating shootings dating back to 2018, but I focus only on the 2021 gang shootings listed below as they fall within the time period I seek to search on the Target Telephone. I provide these shootings as context as I believe that the Target Telephone may contain discussions of criminal activity relating to these shootings and thus seek to search the telephone for such activity.

**Shooting 1: April 27, 2021 Shooting at 673 Dixwell Avenue (.380 firearm)**

15.     On or about April 27, 2021, at 7:36 p.m., the New Haven Police Department's (NHPD's) ShotSpotter gunfire-detection system alerted to 6 rounds fired at 681 Dixwell Avenue. Law enforcement responded to the scene and learned that a man had been shot in the thigh. Officers also recovered four .380 shell casings at the scene. Video surveillance from a liquor store located at 671 Dixwell Avenue showed a dark vehicle turn east on Brewster Street from Dixwell Avenue. A passenger of the dark vehicle then stuck his hand out of the window and started firing at a white vehicle parked on Brewster Street facing east. A male then exited the white vehicle and started walking toward Dixwell Avenue. An unknown male then drove the white vehicle away. Law enforcement determined that the dark vehicle seen in the video was a Honda Civic, which had been reported stolen earlier that same date from a gas station in New Haven, CT. The victim, Robey Smith, is not affiliated with a gang, but he was perceived as disrespectful to the Exit 8 gang. A State of Connecticut search warrant was also obtained for Tyjon PRESTON's cellular telephone, seized on July 14, 2021. The following text message conversation between PRESTON and telephone number 475-254-1076 (with the corresponding contact "Jay🕯🤍") took place beginning at 9:25 p.m. on April 27, 2021, approximately two hours after the shooting:

- tjfrmtha8@icloud.com: "Got em"
- 14752541076: "What woa 😂😂"
- tjfrmtha8@icloud.com: "Robey"
- 14752541076: "This jay nigga"
- tjfrmtha8@icloud.com: "Bro Ik" "And I'm telling you"
- 14752541076: "Hope he checked 🖤🖤🖤"
- tjfrmtha8@icloud.com: "Shii ion kno his mom answered the phone for em in the hospital 🤕🤕"
- 14752541076: "He got hit ina hip"
- tjfrmtha8@icloud.com: "How yk"
- 14752541076 : "On scene" "On dixwell"
- tjfrmtha8@icloud.com: "😂😂😂"
- 14752541076: "Why you ain bring me 🥺"
- tjfrmtha8@icloud.com: "Kuzz we was outside ya shii he came up hq" "You ain't hear us yelling and shii 😂😂"

7

In this conversation, investigators believe that PRESTON was admitting to his involvement in the shooting of Robert Smith. Specifically, PRESTON stated "Got em" and referred to the victim as "Robey" (which investigators believe is a reference to Robert Smith). "Jay" (who is using a telephone number subscribed to JA'SEAN STEPHENSON) then confirmed that the victim was struck in the hip ("[h]e got hit ina hip") on Dixwell Avenue, which is consistent with where Robert Smith was shot (681 Dixwell Avenue). JA'SEAN STEPHENSON also expressed his disappointment in not being involved in the shooting of Smith ("Why you ain['t] bring me"). PRESTON explained that he and others, using the pronoun "we," were near JA'SEAN STEPHENSON's residence ("we was outside ya shii"). PRESTON went on to state that Smith had come up to the Hidden Quarry apartment complex ("hq") located in the Exit 8 area, and that PRESTON did not have time to include JA'SEAN STEPHENSON in the shooting but thought that JA'SEAN STEPHENSON would have heard the commotion. This conversation shows how gang members and associates rely on social media and other forms of electronic communications to communicate regarding their criminal conduct.

### Shooting 2: May 3, 2021 Double Shooting at 401 Forbes Avenue

16.     On or about May 3, 2021, at approximately 11:47 p.m., NHPD officers responded to a call for a person shot at 260 Forbes Avenue, New Haven, CT. Upon arrival, officers observed that two individuals had been shot. One victim appeared to have relatively minor wounds on his buttocks and to a finger and was standing outside of a vehicle. The other victim, in the driver's seat, appeared to be critically injured with a gunshot wound to the head. Having reviewed reports, surveillance video, and body-worn camera footage from responding NHPD officers, I know the victims of this shooting to be Jamie Middlebrook (passenger) and Milton Lloyd, Jr. (driver).

17.     The NHPD determined that the two parties had been shot near the intersection of Brown Place and Forbes Avenue, having just exited the Forbes Best Fuel gas station located at 401 Forbes Avenue a short distance from where the vehicle stopped.  The driver, who had been shot in the head, was initially expected not to survive, but he ultimately did recover, although with some level of brain damage.

18.     Investigators obtained and reviewed surveillance video footage from a number of businesses and residences in the area of the shooting.  In reviewing the videos, law enforcement observed a dark SUV park and reposition on Brown Place just prior to the shooting.  Moments later, an unidentified individual exited the SUV.  At the critical time, approximately 11:46 p.m., that individual ran a few steps towards Forbes Avenue and fired several shots as the victims drove by Brown Place on Forbes Avenue.  After the shooting, the SUV sped away from the scene.  In the video it appears that the brake lights of the vehicle were activated prior to the shooter entering the vehicle, which leads me to believe that there were at least two people in the car—the shooter and the driver.  Witnesses in the area described hearing between four and six gunshots, and investigators recovered six .45 caliber shell casings from the scene.

19.     As part of this investigation, law enforcement further learned of a Snapchat account believed to be shared and used by both Shavarius Smith and Tyriq Martin (both G gang members charged separately) with user ID "tbxby22."  A federal search warrant was obtained for the contents of the Snapchat account from May 1, 2021, to April 27, 2022.  Investigators located a conversation between the "tbxby22" account (believed to have been used by Shavarius Smith during the relevant time period) and Snapchat account "lilwoa88."  A search of the username "lilwoa88" within Snapchat revealed the display name "Jae Honcho 🐐 ⑧ ," which is consistent with Jaedyn RIVERA's Facebook account.  The conversation between RIVERA ("lilwoa88") and

Smith ("tbxby22") spanned May 8, 2021, through May 21, 2021.  A portion of the conversation

from May 8, 2021 and continuing until May 14, 2021 relates specifically to this shooting:

May 8, 2021
- 4:14 p.m.      RIVERA:        I did a couple days ago [emojies] Forbes ave duhh
- 4:14 p.m.      S. Smith:      Me too ask ya boy
- 4:15 p.m.      RIVERA:        Lol ask Jamie and mr.heady

. . . May 14, 2021
- 8:55 a.m.      RIVERA:        What it's looking like w him?
- 8:55 a.m.      S. Smith:      He doing well as you
- 9:33 a.m.      RIVERA:        Checked ? Or just tubbed?
- 9:37 a.m.      S. Smith:      Life Support
- 9:37 a.m.      S. Smith:      Basically rubbed
- 9:38 a.m.      RIVERA:        Ite lmk if shit change

In this conversation, RIVERA took credit for shooting someone a few days prior on Forbes

Avenue ("I did a couple days ago . . . Forbes ave"), which is where Lloyd and Middlebrook were

shot.  RIVERA asked Smith about the victim's condition ("What it's looking like w him?" and

"Checked ? Or just tubbed?"), meaning was the victim killed or just injured, and Smith

responded that the person was on life support.  In this conversation, RIVERA was indicating that

he committed the May 3, 2021, attempted murder on Forbes Avenue.  When RIVERA directed

Smith, another "G" gang member to "ask Jamie" what happened, he was referring to

Middlebrook.  RIVERA's reference to "mr.heady" was a provocative reference to Lloyd, who

was shot in the head.  Again, this conversation shows how criminal activity is discussed by gang

members and associates over social media.

### Shooting 3: May 10, 2021 Shooting at 1228 Quinnipiac Avenue (.380 firearm)

20.      On or about May 10, 2021, at 3:56 p.m., NHPD received a gunshot complaint in

the area of Foxon Boulevard and Quinnipiac Avenue.  Officers responded to the scene and located

five .380 casings in the roadway as well as two vehicles that had been struck by gunfire.  The

intended target of the gunshots appeared to be a white Infiniti that had been parked on Runo Terrace behind Quinnipiac Elementary School. The Infiniti had an apparent bullet hole in the rear driver door, and the rear driver's side tire was flat and also had a defect.

21.    A witness informed law enforcement that he had seen an older model silver Toyota Camry fire rounds at a white Infiniti. Three males were in the Camry, including two in the front of the vehicle wearing black and a rear passenger wearing a full-face mask exposing only his eyes. The witness stated that the rear male passenger appeared to be hyping himself up prior to the shooting.

22.    The NHPD utilized the National Integrated Ballistic Information Network (NIBIN) to analyze the .380 casings found on the scene. NIBIN analysis uses collected ballistics evidence, specifically expended shell cases found at the scenes of shootings, and then analyzes the cases for commonality against other shell cases that have been collected from other shooting scenes. NIBIN analyzes the firing pin impressions, ejector marks and other unique marks on the breach face of the shell case in order to link ballistic evidence. These marks are unique to specific firearms and are similar to the way that fingerprints are unique to individual people. In the same way that no two people have the same fingerprints, no two firearms will leave the same exact marks on a shell case.

23.    NIBIN analysis of the .380 casings recovered from 1228 Quinnipiac Avenue indicated that those casings and the .380 casings recovered from Shooting 1 are preliminarily linked.

24.    On or about March 2, 2022, the Hon. S. Dave Vatti authorized a federal search warrant for the search and seizure of historical information from cellular service providers regarding what cellular devices connected to specific cellular towers during specific times ("tower

information"). Preliminary analysis of tower information produced in response to that warrant has revealed that cell phones believed to be used by Exit 8 gang members Hector DELGADO and Charles PHILLIPS, connected to cell sites in the general area of this incident during the approximate ten minute prior and ten minute after window surrounding the shooting.

25.     Investigators also conducted a review of PRESTON's cellular telephone and found the following text message exchange between PRESTON, and telephone number 1-203-747-0012 with the saved contact "Jae Honcho 🔘 🖤" (**RIVERA**) starting at approximately 4:05 p.m. on May 10, 2021:

- **RIVERA**: "Bandz got ya shit" "😿 😿 😿 😿 😿 😿 😿"
- PRESTON: "Ik I heard em 😂 😂" "Loved "😿 😿 😿 😿 😿 😿 😿"
- **RIVERA**: "Chased em all the way from the 9" "To the strip 😂 😂"
- PRESTON: "Dggg you got itttttt 😿 😿 😿 😿 😿 😿"
- **RIVERA**: "Love you woa"
- PRESTON: "Love you too woa"

In this conversation, **RIVERA** informed PRESTON that "Bandz" had his firearm ("Bandz got ya shit") and PRESTON responded that he was aware and that he heard him ("Ik I heard em 😂 😂"). Investigators are still attempting to determine the identity of "Bandz." It should be noted that, during this time period, PRESTON would stay at 271 Eastern Street, New Haven, which is in close proximity to where the shooting took place, therefore he likely heard the gunshots. **RIVERA** then explained that they chased the intended target from the area of Ferry Street and Chatham Street to Foxon Boulevard ("Chased em all the way from the 9" "To the strip 😂 😂"). Investigators are aware that the area of Ferry Street and Chatham Street is commonly being referred to as the "9," and that the area of Foxon Boulevard where the shooting occurred is commonly referred to as "the Strip." Again, this message shows how gang members and associates talk about criminal activity over social media.

**Shooting 4: May 14, 2021 Shooting at 42 Kossuth Street (.380 firearm)**

26.      On or about May 14, 2021, at 9:22 p.m., ShotSpotter alerted to probable gunshots at 42 Kossuth Street in New Haven.  Officers responding to the scene spoke with witnesses who said they heard gunshots and saw a Honda leave the area with the victim inside, heading for the hospital.

27.      Officers located six .380 casings in front of 42 Kossuth Street.  NIBIN analysis of those casings indicated that they are preliminarily linked to the casings recovered from Shooting 1 and Shooting 3.

28.      At 8:24 a.m. on May 20, 2021, over Facebook, RIVERA taunted Facebook user "Tyesha Ra'Nae," or Tyesha Gardner, and took credit for shooting Charles Wearing on May 14, 2021.  RIVERA wrote Gardner, "lmk how ya bro doing too, 'gws' [get well soon]."  Later, he says, "Shit tell chuck get up, he know wassup," specifically referencing Wearing.  Then he stated, "now I'm telling you tell chuck I said gws," and Gardner stated "He ALIVE shot 7 times and living G."  Taking credit for the shooting, RIVERA responded: "I know how many times he got shot."

29.      Preliminary analysis of cell site location information obtained pursuant to a federal search warrant indicates that a cellular telephone used by Exit 8 member Jaedyn RIVERA connected to a cell site and sector facing the crime scene between approximately 9:16 p.m. and 9:20 p.m., receiving four calls and one text message during this time period.

**Shooting 5: May 17, 2021 Shooting at 55 Norton Street (.380 firearm)**

30.      On or about May 17, 2021, at 8:10 p.m., ShotSpotter alerted to one shot fired in the area of 55 Norton Street in New Haven.  Upon arriving at the scene, officers located an abandoned white Nissan Rogue that was still on and in drive but had crashed into a parked vehicle on Norton Street.  A registration check revealed that the Nissan had been stolen earlier that day.

A witness at the scene told law enforcement that she had seen the white Nissan driving on Norton Street with a dark-colored sedan (possibly a Honda) following behind. The witness heard one shot, which she believed came from the dark-colored sedan. The driver of the white Nissan then exited the vehicle and fled on foot, while the dark-colored sedan drove east on Chapel Street.

31.     Officers located one spent .380 shell casing on Norton Street near the intersection with Chapel Street. NIBIN analysis determined that this casing was preliminarily linked to the casings recovered from Shooting 1, Shooting 3, and Shooting 4.

32.     Preliminary analysis of cell-site location information obtained from devices used by Exit 8 members indicates that the DOUGLAS' telephone exchanged calls through the cell site and sector facing the crime scene at approximately 7:40 PM. Specifically, at 7:40 p.m., approximately half an hour before this incident, DOUGLAS received a call from Exit 8 associate Donnell ALLICK and placed a call back to ALLICK.

### Shooting 6: May 19, 2021 Shooting at 1319 Ella T. Grasso Boulevard (.380 firearm)

33.     On or about May 19, 2021, at 8:00 p.m., officers responded to the area of Ella T. Grasso Boulevard and Stanley Street on a report of shots fired. ShotSpotter had activated to three rounds at 70 Stanley Street and four rounds at 1319 Ella T. Grasso Boulevard at 7:59 p.m. One victim, Tashawn Brown, suffered a gunshot wound to his abdomen and ultimately died due to his injury.

34.     Video surveillance showed a black sedan pull onto Stanley Street from Ella T. Grasso Boulevard and park in front of 71 Stanley Street. The victim and three unidentified males exited the black sedan and walked west toward the Boulevard. The males then stop in front of 1307 Ella T. Grasso Boulevard when a silver car drives north on the Boulevard and appears to

shoot in their direction. The victim fell to the ground and the three other males ran back toward Stanley Street.

35.     Witnesses also described a black Nissan Sentra park in front of a white Lincoln SUV at 71 Stanley Street. After the witnesses heard gunshots, three younger black males wearing ski masks were seen running and entering the black Nissan Sentra and driving away. Other witnesses stated that the male who was believed to have shot the victim was from the Exit 8 area.

36.     Officers located .380 shell casings on Ella T. Grasso Boulevard between Stanley Street and Edgewood Avenue. NIBIN analysis of those casings indicated that two separate .380 firearms were used in this shooting, one of which is preliminarily linked to the shell casings recovered from Shooting 1, Shooting 3, Shooting 4, and Shooting 5. Officers also located 9mm casings at this incident that were not linked to any previously mentioned incidents, but was later linked to Shooting 9 discussed below.

**Latasha Brown**

37.     On March 21, 2022, Assistant United States Attorney (AUSA) Kaoutzanis and ATF New Haven Task Force Officer (TFO) Borges met with Latasha Brown at the United States Attorney's office in Bridgeport, Connecticut. The purpose of the interview was to discuss the events and circumstances leading to the death of her son, Tashawn Brown. Latasha Brown stated she was at Edgewood Park with her family and extended family having a BBQ when her two sons (Angelo Gibson and Tashawn Brown) got into a physical altercation with other young males to include known Exit 8 gang members, QUAYMAR SUGGS and HECTOR DELGADO. Angelo Gibson had previously had a problem with QUAYMAR SUGGS, as he had been jumped by SUGGS. Later that same date, Latasha Brown stated she observed a black sports utility vehicle (SUV) being driven by a black male, subsequently identified as ANTWAN HILL (YOB 2004),

and a Hispanic male, subsequently identified as HECTOR DELGADO (YOB 2003) seated in the front passenger seat. Latasha Brown was able to identify these individuals. She said that DELGADO exchanged words with Brown and other family members until the black sports utility vehicle finally left.

38.     Brown stated that after the vehicle left, everyone was separated and left. Later that same date, as Brown was standing at a grill, she observed Quaymar SUGGS come to the park from Chapel Street and interact with his mother. Brown observed Quaymar SUGGS running down a hill and stated that was when the shooting started. Brown admitted that she didn't see Quaymar SUGGS in possession of a firearm. Brown did, however, observe one of the shooters from a silver SUV. Brown explained that the shooter was sitting on the door frame of the rear driver's side window shooting towards her son, Tashawn Brown. Brown stated that the shooter was smiling as he was shooting. Brown was told by a relative that the shooter's alias is "Blam" and Brown subsequently viewed a photograph of "Blam" on Facebook. Brown confirmed that the individual she observed on Facebook appeared to be the shooter hanging out of the window. Investigators know "Blamm" to be a street alias for DOUGLAS.

39.     Another witness described a man with braids, which were described as either "Pop Smokes" or "ASAP Rocky" braids, shooting from the back passenger window. Officer Eisenhard located camera footage from 1307 Ella T. Grasso Boulevard, which showed a black sedan pull onto Stanley Street from Ella T. Grasso Boulevard and park in front of 71 Stanley Street. The video shows Brown exiting the vehicle with three unidentified males. The males began to walk west on Stanley Street toward Ella T Grasso Boulevard when a silver car driving north on Ella T Grasso Boulevard and appears to shoot in the direction of the males. This is the vehicle from which DOUGLAS is believed to have been shooting.

40.     Preliminary analysis of historical cell-site data produced in response to a federal search warrant has revealed that a cell phone number believed to be used by DOUGLAS utilized a cell site adjacent to this crime scene at approximately 7:57 p.m. On May 20, 2021, at 9:02 a.m. in a conversation with "Honcho Skii," (believed to be an Exit 8 associate and possible relative of the deceased Meyers) RIVERA posted on Facebook, "Losses Come W the Game It all Matters on How U bounce Back from the Loss," to which "Honcho Skii" responded "Yes Yes." On May 20, 2021, at 9:05 a.m., RIVERA posted an article on Facebook regarding the homicide.  In reviewing Facebook, case agents further determined that RIVERA reached out to Philip MOYE approximately 38 minutes after the homicide and a subsequent Facebook video chat occurred at 8:41 p.m.   These contacts again show the use of social media and telephones by Exit 8 gang members and associates to discuss criminal activity.

**Shooting 7: May 20, 2021 Shooting at 168 West Street (.380 firearm)**

41.     On May 20, 2021, at approximately 2:14 p.m., ShotSpotter alerted to shots fired at 168 West Street in New Haven.  Officers found twelve 9mm casings on the sidewalk in front of 174 West Street, as well as a mix of .380 and .45 caliber casings and a bullet fragment at the intersection of Congress Avenue and West Street.  Two witnesses said they heard gunshots but did not see anything—one was a resident who lived nearby, the other was the owner of a vehicle that was struck by gunfire.

42.     A camera at the Congress & West intersection captured some video footage of the incident.  The video shows a dark-colored BMW driving northeast on Congress, passing West Street, and then abruptly pulling over to the right shoulder and parking.  Two males immediately exit the BMW and run toward the Congress & West intersection, out of view.  One of the males exited from the rear passenger-side door and appeared to be a Black male wearing a black mask, white t-shirt, light-colored shorts, and dark-colored sneakers; this male appeared to be holding a

handgun in his right hand. The other male, who exited from the rear driver's-side door, appeared to be a white or Hispanic male wearing a black mask, white t-shirt, white pants, and white sneakers. Shortly after the two men exited the frame, they reentered the frame running back to the BMW and got back into the same rear side doors they exited from. The BMW then drove away on Congress. The vehicle appeared to have an emblem or a sticker on the left side of the license plate.

43.     Soon after, a TFO who had reviewed the video footage saw a dark BMW with four males in the car and with a distinct sticker or emblem on the left side of the rear plate driving in New Haven. A registration query revealed that the car had been stolen from Fairfield. Law enforcement attempted to stop the BMW at an intersection, but it eluded officers and drove recklessly onto I-95 South, at which point, officers terminated pursuit.

44.     NHPD personnel who are familiar with gangs/groups in New Haven, and in particular with members of Exit 8 and the Hill, later reviewed the footage from the shooting and observed that the lighter-skinned male fit the description of JAEDYN RIVERA while the darker-skinned male holding the handgun fit the description of TYJON PRESTON, based on previous encounters the detective had with both RIVERA and PRESTON. Both RIVERA and PRESTON are known members/associates of Exit 8.

45.     RIVERA and DEVIN SUGGS were apprehended by NHPD on May 21, 2021, with the stolen BMW. During that incident, law enforcement recovered a loaded black Ruger LCP .380 handgun with serial number 372-35841, which was reported stolen from Stratford in 2018, from RIVERA and a black/brown FN .32 caliber handgun, serial #496172. NIBIN analysis of the Ruger recovered from RIVERA on May 21, 2021, indicated that there is a preliminary link between the Ruger and the fired .380 casings recovered from Shooting 1, Shooting 3, Shooting 4, Shooting 5, Shooting 6, and Shooting 7. RIVERA later spoke with law enforcement on May 22, 2021, after

signing and dating the NHPD's *Miranda* form and admitted his involvement in the Congress & West shooting but would not provide the names of any other individuals involved in the incident.

### Shooting 8: May 20, 2021 Double Shooting at 41 Redfield Street

46.    On May 20, 2021, at approximately 8:27 p.m., the NHPD responded to 41 Redfield Street in New Haven for a report of a person shot.  Upon arrival, officers observed that multiple people had been in the backyard of 41 Redfield Street for a party when multiple gunshots were fired.  There were several 911 callers, some who reported hearing as many as 15 shots fired.  One caller reported seeing a dark-colored sedan fleeing.  Two victims were transported to Yale New Haven Hospital for medical treatment; both survived their injuries.

47.    Officers located five 9mm casings in the rear of 41 Redfield Street, eight .45ACP cartridges and a pair of Nike Air Vapor Max sneakers (size 9) in the rear of 56 White Street.

48.    In RIVERA's post-arrest interview on May 22, 2021, he admitted to his role in this shooting but again refused to provide information on any other individuals involved in the incident. Based on my training and experience, and involvement in this investigation, I believe that RIVERA was adhering to Exit 8's code of "not snitching," in that he refused to identify any of the "friends" who were with him.  I also believe that RIVERA and his Exit 8 associates have used the .380 and other firearms in violent crimes in the City of New Haven.

49.    NIBIN analysis of the recovered .45 casings from this incident indicated that there is a preliminary link with the .45 casings recovered from Shooting 7, at Congress/West.  NIBIN analysis of the recovered 9mm casings from this incident indicated that the 9mm casings were preliminarily linked to numerous other shooting incidents in the City of New Haven.

### Shooting 9: July 5, 2021 Shooting at 61 Truman Street

50.    On or about July 5, 2021, at 2:42 p.m., ShotSpotter alerted to three shots fired at 73 Truman Street in New Haven.  Upon arrival, officers located the victim, Ciera Jones, on the

walkway of 61 Truman Street suffering from a gunshot wound to the head. The victim later died due to her injuries.

51.     Surveillance cameras showed an SUV park on Clover Place west of Truman Street. Two individuals exited the vehicle and walked to the corner of Clover Place and Truman Street. Both individuals then began to shoot north on Truman Street, where the victim was located. Additional surveillance footage captured a plate for the vehicle, which was determined to be a Honda Pilot. A registration check indicated that the vehicle was stolen from Stratford. The Honda Pilot was recovered later that day on Lenox Street in New Haven and was observed to have a broken rear passenger's-side window as well as several spent shell casings inside the vehicle.

52.     Officers located seven shell casings on the southwest corner of Clover Place and Truman Street and eight shell casings on the northwest corner of the same intersection, in the area where the two men described above were shooting from. These casings included 9mm casings.

53.     NIBIN analysis of the 9mm casings recovered from this incident were preliminarily linked to the 9mm casings recovered from Shooting 6, as well as multiple other shooting incidents in New Haven. These incidents are included because I believe the Target Telephone may contain evidence of these incidents. Carmichael likely was aware of these incidents and may have spoken directly with Exit 8 gang members about them.

54.     I am additionally aware as described above that Exit 8 gang members engage in drug dealing. Some of them have state and/or federal convictions. I am also aware of more than 10 NHPD reports spanning 2018 through 2022 wherein known Exit 8 gang members and associates were arrested for possession of with intent to distribute narcotics. There is also witness testimony that we have obtained throughout the course of this investigation relating to their drug trafficking.

55.     Additionally, Facebook records obtained for 11 Exit 8 gang members' accounts, more fully described below, have revealed numerous drug-related conversations.  Some include the subject's conversations with customers, and some are between Exit 8 gang members coordinating sales of drugs to customers.  Drug trafficking is also discussed at times within large group chats.  I have probable cause to believe that aside from the acts of violence, there may also be evidence of narcotics trafficking on the Target Telephone with Carmichael speaking to Exit 8 gang members or communicating with them about narcotics trafficking.

## EXIT 8'S USE OF CELLULAR PHONES

56.     As indicated above, the investigation has shown that members of the Exit 8 gang use cellular phones and social media to take videos and photos of themselves with firearms or stolen vehicles, and that they often use their phones before and/or after shooting incidents to communicate regarding criminal activity.  For example, investigators' review of DOUGLAS' phone, which was seized by NHPD on June 7, 2022, pursuant to a state search warrant revealed that, immediately after a firearms seizure on April 29, 2022, DOUGLAS used his phone to communicate with ALLICK and others about the incident. DOUGLAS was later charged in state court with possession of this firearm, despite him having fled from the scene.

57.     Likewise, review of one of SUGGS's iPhones pursuant to a state search warrant revealed activity on the device before and after Shooting 1, which took place on April 27, 2021, at approximately 7:36 p.m.  Analysis of the device identified text messages wherein the user of the phone stated they were in a "Black Honda" at approximately 4:34 p.m. that day.  A black Honda had been identified and seized as a suspect vehicle in the shooting.  At approximately 7:25 p.m., the device received a 13 second Facebook audio call from the user "Lul Munch" (100009520770065).  The shooting took place at approximately 7:36 p.m.  Nine minutes later, at approximately 7:45 p.m., the device placed a 15 second Facebook audio call to "Lul Munch."  In

addition, a video created at 9:23 p.m. after the shooting depicted an individual pointing what appears to be a semiautomatic pistol at the camera while in "Selfie Mode." The video captures down the barrel of the pistol.

58.     Similarly, on May 21, 2021, following Shooting 7, investigators reviewed PRESTON's Instagram profile, "honchogang.tj," and observed a photograph of RIVERA, PRESTON, and DEVIN SUGGS that had been posted after the time of Shooting 7. The caption to the photograph was "Got the drop on Honchogang I suggest you don't pull up." A NHPD detective also viewed RIVERA's Facebook page ("Jae Honcho"), which had a video of RIVERA and PRESTON sitting in the back of a moving car wearing clothing similar to the two males seen in the video of the shooting. Additionally, a video from SUGG's phone extraction from Thursday, May 20, 2021, at approximately 3:10 PM, depicts RIVERA and PRESTON sitting in the back seat of a moving vehicle with a gray and light color interior, was similar to the video the Detective provided. The BMW that was recovered on May 21, 2021, has the same color interior as both videos. The investigation has also revealed that the targets communicate extensively over social media which they are believed to primarily access from their cellular telephones. Moreover, it is my understanding from my review of the social media that they send messages to each other and to people they associate with like Jameyah Carmichael.

### Jameyah CARMICHAEL'S Instagram

59.     On August 23, 2022, U.S. Magistrate Judge S. Dave Vatti authorized a search warrant for the contents of five Instagram accounts, to include the account used by Tyjon PRESTON (Instagram account # 42999347973). I have reviewed the data provided by Instagram and located a group conversation that includes a number of known or suspected Exit 8 gang members and associates. This includes Hector DELGADO, Jarel DELGADO, Quaymar SUGGS and Antoine HILL. Jameyah Carmichael is part of this conversation.

60.     I have identified Carmichael's Instagram account to be "meyahhh._" account # 5758860758.  I found a number of occasions wherein a message participant makes a request of "Jameyah," "Jamayah," or "meyah," and the account bearing "meyahhh._" account # 5758860758 responds, or that the "meyahhh._" account makes a comment, and someone responds by calling her "Jameyah," "Jamayah," or "meyah."   These are all different versions of Carmichael's first name and all of these names are associated with telephone number 475-449-7160 (the **Target Telephone**).  As more fully discussed below, this number is used by Carmichael, per both DOC and NHPD records.

61.     From within the Instagram group conversation, I observed a number of interactions that lead me to believe that Carmichael is an active participant in, or has direct knowledge of, the criminal activities of the Exit 8 gang.  Some of the portions of the group conversation are as follows:

**6/27/2021**

CARMICHAEL:          like word to everything i love don't come to my cousin cookout

. . .

H. DELGADO:          Why would I not be there ?

CARMICHAEL:          and i don't want you

CARMICHAEL:          i got somebody

H. DELGADO:          Right you fw the opps ?

H. DELGADO:          You shouldn't be there

k.i:                          ????

H. DELGADO:          Crushed her

CARMICHAEL:          i fw an 8 nigga

23

CARMICHAEL:        lmao what opp

k.i:               not wa he was sayin

k.i:               like yu fw the opps

k.i:               not fuckin wit as in datin

CARMICHAEL:        ion fw with no opp only person i associate with is my cousin

62.    In this conversation, I believe that Carmichael is requesting that Hector DELGADO not come to an event hosted by one of her cousins.  DELGADO replies by calling her out as associating with the opposition ("*you fw the opps ?*"), indicating that she should not attend the event in a tit-for-tat response.  Carmichael indicates that she associates with or "fucks with" a member of the Exit 8 gang – "*i fw an 8 nigga.*"  The user of the "k.i" account attempts to clear up the meaning of "fucking with" someone, and Carmichael states that she does not deal with opposition members, implying that the only such person would be her cousin – "*ion fw with no opp only person i associate with is my cousin.*"  Case agents are still trying to identify which cousin she is referring to in this message, however, Jeremiah Carmichael (believed to be related to her) is a known "G" gang member and is suspected of killing Exit 8 gang member Jorge Delgado, a/k/a "John Wick," on April 11, 2022 (approximately 10 months after the preceding conversation).

63.    In another Instagram conversation, Carmichael sent a photograph as depicted below.

**9/1/2021**

CARMICHAEL:        meyahhh._ sent a photo.

24



| | |
|---|---|
| CARMICHAEL: | ^ who gave him these |
| hgkizzy: | ???????? |
| hgkizzy: | da nigga was n a mental illness shit niggas was saying free him like huh |
| CARMICHAEL: | I HEARDDDDD THAT! So it's true then |

64.     In this portion of the conversation, Carmichael sent a screenshot of Instagram user "Hoeslovhondo's" post, apparently showing him holding two assault weapons[2].  She then asks the group an apparent serious question of who would have provided "Hoeslovhondo" with firearms.

---

[2] Based on my training and experience, I believe that the pictured firearms may, in fact, be non-firearm replicas, such as BB-guns or other items, however, this cannot be determined from this picture alone.  I believe that the participants in this chat were likely to believe that the items were *bona fide* firearms, as none of the following conversation addressed this as a possibility.

"hgkizzy" seemed to know that this person had mental health issues, and Carmichael indicates that she had heard the same.  While no one in the group chat, to include Carmichael, appears to be responsible for this transfer of weapons to an unstable person, that fact that her only question was who the source of the items was shows how deeply ingrained to the culture of violence and weapons that is part and parcel of gang activity.

65.     Similarly, the below conversation indicates her entrenchment in the group and its violent activities.

**9/2/2021**

CARMICHAEL: are ya coming to the wedding ? It's no food just bottles & flocks

CARMICHAEL: Glocks*

. . .

PRESTON: Well how is it bottles and glocks if everybody don't have glocks

66.     In this portion of conversation, I believe that Carmichael's statement, while possibly being tongue-in-cheek, shows her knowledge and tacit approval of firearms possession by others on the group chat, which includes several Exit 8 gang members.  She even approves of guests having their firearms with them during this event.  PRESTON appears to respond more seriously than jokingly that not every member of the group has a firearm generally, or a Glock specifically.

67.     The below conversation with PRESTON also describes her knowledge of the use of firearms by Exit 8 gang members.

**9/2/2021**

PRESTON: My baby got shipped guysssss

Hgkizzy: hgkizzy liked a message

PRESTON: I'm back outside sooonnnn

| PRESTON: | Been a long two weeks |
| CARMICHAEL: | Huh? |
| PRESTON: | And I got the 30 ouuuweeeee |
| prettyyluhh._dess ya: | I had a dream I was getting chased by a old white guy wit a shotgun |
| hgkizzy: | send a flic to me |
| PRESTON: | Nigga it ain't here yet |
| PRESTON: | Kike got my 30 and taking this 10 round shii |
| k.i: | ouuuweeee |
| PRESTON: | Sooo which one of ya trynna like uhh |
| PRESTON: | Buy my beam |

68.     In this portion of the conversation, I believe that PRESTON is announcing to the group, which includes Carmichael, that he ordered a firearm, or possibly a Privately Made Firearm (PMF) kit.  He advises that he is getting a 30-round magazine with it – "*And I got the 30 ouuuweeee*," and Instagram user "hgkizzy" asks to see a picture of it – "*send a flic to me*." PRESTON responds that the firearm "*ain't here yet*," and references "Kike" having one of his 30-round magazines and will be taking the 10-round magazines that presumably will be coming with the new firearm.  I further believe that PRESTON is describing the impending receipt of a firearm, as he asks if anyone want to by purchase the laser site on his current firearm – "*Sooo which one of ya trynna like uhh*" "*Buy my beam*."

69.     In other conversations like this one below, she shows here awareness of Exit 8 and its members.

**9/3/2021**

| CARMICHAEL: | Nobody gonna slam me lmaooo and I got Ron here |
| skyysmurkio_: | nahhh cus whattttttttt |

27

| | |
|---|---|
| CARMICHAEL: | Ron definitely will whoop em |
| skyysmurkio_: | who the hell is ron |
| CARMICHAEL: | Ron a 8 nigga but he the only one That's here |

. . .

| | |
|---|---|
| k.i: | he aint get jumped? not one time |
| CARMICHAEL: | bro they confronted him |
| CARMICHAEL: | Well one boy |
| CARMICHAEL: | Last year |
| k.i: | dey not 88k frl |
| CARMICHAEL: | One boy was bout to fight him , they be plotting cf |
| k.i: | i would of been on boi ass he da only opp hea oh yeaaa |
| CARMICHAEL: | But Ron not a pussy |
| k.i: | dey pussy |
| CARMICHAEL: | Exactly |
| CARMICHAEL: | Cause Ron the ONLYYY 8 nigga |
| CARMICHAEL: | And niggas kno dat |

70.     In this portion of the conversation, Carmichael is indicating that she has the protection of Exit 8 gang member "Ron" – *"Nobody gonna slam me lmaooo and I got Ron here."* I believe this based on the context of the remaining section of this conversation. When Instagram user "skyysmurkio_" asks who "Ron" is, Carmichael replies that he is a member of Exit 8 – *"Ron a 8 nigga."* There is then conversation about "Ron" being attacked or *"jumped."* Carmichael indicates that someone did confront "Ron," but that no fight occurred. The user of the "k.i" account states that the person or persons with whom "Ron" almost fought was not real opposition to Exit 8 or were not enough of a threat to cause concern – *"dey not 88k frl."* I know from my training, experience, and involvement in this investigation that "88k" stand for "88 killers," or opposition to the Exit 8 gang, which as indicated above, uses both the numerals "8" and "88" to

represent the gang.  Carmichael expresses her admiration for "Ron," – "*But Ron not a pussy*," and "*Cause Ron the ONLYYY 8 nigga.*"

71.     Her clear references to "8," as in the Exit 8 gang and members, and her understanding and acceptance that "Ron," as an Exit 8 member, could or would be subject to a physical or verbal altercation about being such a member, shows her intimate knowledge and approval of gang life.  By invoking that "Ron" would take care of her, this furthers my belief that Carmichael associates with the Exit 8 gang and that members have taken her into their confidence.

72.     While I am aware that Instagram is accessible via a web browser on a traditional computer, I know that the overwhelming majority of Instagram users access the application on a mobile device such as the **Target Telephone**.  In this case, I am confident that Carmichael accesses Instagram from the **Target Telephone** based on her posting of the screenshot shown above.  I recognize this to be a smartphone screenshot of an Instagram account begin viewed (by Carmichael on the mobile application).  I have also observed numerous other pictures sent by Carmichael to the group chat that are easily recognizable as screenshots from a mobile device such as the **Target Telephone,** which for reasons more fully described below, I believe to be an iPhone, a modern smartphone capable of accessing social media platforms and taking and sending screenshots.  This includes screenshots of text message/iMessage conversations, Instagram posts, and Facebook activity, although I have not been able to identify Carmichael's Facebook account from the images.

**CARMICHAEL'S DOC CALLS WITH RIVERA**

73.     Investigators also have listened to a portion of recorded telephone calls made by JAEDYN RIVERA.  RIVERA had been in DOC custody from approximately May 2, 2018, through April 5, 2021, when he was released to a halfway house.  RIVERA was returned to DOC custody, subsequent to his arrest, as indicated above, on approximately May 24, 2021.  He remains

in custody as of this date. RIVERA'S DOC caller list includes 475-449-7160 (the **Target Telephone**) as an active caller (as of September 9, 2021) associated with Jameyah Carmichael, 29 Atwater Street, New Haven, CT 06513. I also know that, on May 28, 2021, RIVERA addressed the person believed to be Carmichael as "Jameyah." At various points in various calls, RIVERA and Carmichael discuss their romantic relationship, to include Carmichael, on May 28, 2021, telling RIVERA she was pregnant and planning on having an abortion. RIVERA responded, "you better not kill my baby or imma kill you," but then stating that he was kidding.

74. Additionally, Carmichael provided telephone number 475-449-7160 (the **Target Telephone**) to the NHPD on February 3, 2022.

75. Some of the conversations between Carmichael and RIVERA appear to reference criminal activity. One such conversation, which occurred on June 4, 2021, Carmichael tells RIVERA that she still has his scale, and that she was going to sell it (apparently referring to a scale for weighing drugs). RIVERA tells her to give it to "Little Emmy," believed to be HARRINGTON. After Carmichael states that she is going to keep the scale, RIVERA replies "You can't . . . first of all you said that on this phone. You bugged out . . . Throw that shit out . . . nah give that shit to Little Emmy."

76. Some of the conversations appear to be directly related to Exit 8's gang activity. One such call was on June 17, 2021. During that call, Carmichael advises RIVERA that "G-Rich," (known to law enforcement to be Richard Whitaker, Hill Gang member) was killed. RIVERA appears to be happy with this news and asks Carmichael to call numbers associated with HARRINGTON and then PRESTON, neither of whom answered. Carmichael then said words to the effect of:

"No, I'm scared umm. Then the girl Kate Cash is on Facebook, umm KCash, first of all she about to die too because she posted on Facebook umm, she posted, Dante posted, the night it happened Dante posted, free, I mean no, Dante posted sorry for Honcho and said some other slick junk and then the girl KCash reposted and then after that she was like, 'how it feel for that cookie to crumble?' And all his niggas that, whoever TNG is, whatever gang that is they was under it like you about to die, you and your baby, when I catch you, I'm killing you, they went to her job, they went to her house."

77.     This conversation shows Carmichael using the **Target Telephone**, in her capacity as RIVERA'S link to other Exit 8 gang members, discussing gang activity on social media and in the streets. Carmichael seems well versed in who is who and the impact of each person's actions, including apparent overt steps taken by persons unknown to follow through with a threat to kill "KCash" and her baby.

78.     I have further observed that RIVERA occasionally directs Carmichael to contact other people for a 3-way call, utilizing the **Target Telephone.** I know that making such 3-way calls with an inmate is a violation of DOC rules. For example, on August 5, 2021, Carmichael connects RIVERA to his father at 203-606-0248. On June 24, 2021, Carmichael, RIVERA and "Emmy" (possibly Emerson Harrington, an Exit 8 gang member) have a 3-way call. On June 18, 2021, RIVERA directs Carmichael to call "TJ" (PRESTON) at 203-600-2161. On June 17, 2021, RIVERA directs Carmichael to call his "brother" at 475-243-4275, and the 3-way call is completed. Based on the telephone number provided, I believe the third party to this call was Jorge Delgado, a/k/a "John Wick," an Exit 8 gang member who was shot and killed on April 11, 2022. On June 30, 2022, Carmichael is even able to complete a 3-way call between RIVERA and PRESTON, who was incarcerated at a different DOC facility. The two then discuss how they were

both served with DNA search warrants (ATF executed DNA search warrant for both PRESON and RIVERA the morning of June 30, 2022). I know from my training and experience, that, even if not talking, Carmichael would hear both other parties talking during all of these 3-way calls.

79.     While further review of the content of the calls is ongoing, I have obtained DOC information that indicates the **Target Telephone** has had contact with approximately seven DOC inmate accounts, in addition to RIVERA'S account.  While it appears that RIVERA may be using other inmate's accounts to speak with Carmichael via the **Target Telephone**, possibly in an effort to conceal his conversations from the scrutiny of law enforcement, it is also possible that Carmichael may be speaking with other inmates at RIVERA'S request.  Per DOC records, these calls from other inmate accounts to the **Target Telephone** spanned from approximately November 11, 2021, through September 28, 2022, the records having been queried on September 29, 2022. Approximately 17 of the approximately 35 calls made to the **Target Telephone** by accounts other than RIVERA'S occurred during September 2022, indicating that this type of call has increased significantly within the past less than two months.

80.     According to information provided by the DOC, RIVERA, calling out to the **Target Telephone**, remains in contact with Carmichael as of this writing.

### CARMICHAEL'S PHONE CONTACTS

81.     As part of this investigation, law enforcement has acquired call detail records (CDRs), for certain periods of time, for telephones known or suspected to have been used by Exit 8 gang members.  Additionally, law enforcement has executed search warrants on a number of seized cellular telephones used by Exit 8 gang members and associates.  ATF has been able to examine and extract data from several of these devices.  Combining the relevant data from the CDRs and seized cell phones, I have been able to analyze call patterns and frequency from the

admittedly patchwork data from various devices and telephone accounts, each with a discreate time period of data.

82.     From within this data, I observed that Carmichael's contacts, utilizing the **Target Telephone**, to RIVERA'S telephone, represent approximately 50% of all of the data for the **Target Telephone** captured by ATF.   This high percentage of calls to one person is consistent with my experience for persons involved in an intimate relationship.   The data also shows that the **Target Telephone** has had multiple contacts with known Exit 8 gang members during 2021 and 2022, to include ALLICK, Tyrone FELTON, Jorge Delgado, STEVENSON, Hector DELGADO, Devin SUGGS, Samuel DOUGLAS, and BARNES.   While some of these contacts may be the result of 3-way calls by Carmichael and RIVERA, available data does not match identified 3-way calls with these contacts between the **Target Telephone** and these Exit 8 gang members.   Some of these contacts appear to be text messages, which would indicate that they were not part of a 3-way call.

83.     I believe that these contacts and their calls and text messages to Carmichael, are likely to contain evidence of RIVERA'S communications to other Exit 8 gang members with Carmichael as the conduit.   I also believe that the reverse is likely, in that other gang members who wish to pass information to RIVERA would rely, in part, in contacting Carmichael for the purpose of having her relay information to RIVERA.   Based on the limited data available related to the **Target Telephone**, I observed both incoming and outgoing calls for the **Target Telephone** with the additional Exit 8 gang members.

84.     I believe that evidence of the target offenses will be found within Carmichael's device (the **Target Telephone**) as relates to her direct involvement with the Exit 8 gang and will also very likely contain evidence of the target offenses by other Exit 8 gang members, known, and

unknown, including but not limited to ALLICK, FELTON, Jorge Delgado, STEVENSON, Hector DELGADO, Devin SUGGS, DOUGLAS, PRESTON, and BARNES.

85.     Carmichael, using the **Target Telephone**, continues to have contact with RIVERA at the DOC as of this time.

### CARMICHAEL'S Facebook Account

86.     On May 23, 2022, U.S. Magistrate Judge S. Dave Vatti authorized a search warrant for the contents of 11 Facebook accounts, to include accounts used by Exit 8 gang members RIVERA, STEVENSON, PRESTON, Quaymar SUGGS, Devin SUGGS, Kevaughn SUGGS, PHILLIPS, DOUGLAS, HYMAN, ALLICK, and CLARK.

87.     From within the records provided by Facebook, I observed a number of conversations involving Facebook user "Meyah Meyah," account # 100055607201122.  I have observed the publicly available account for "Meyah Meyah," currently listed as "Lakeisha Savage," with URL: https://www.facebook.com/**meyah.meyah**.378537 [emphasis added] and observed that the featured person, whom I believe to be the owner and user of the account, matches the profile picture of Carmichael's Instagram account.  On February 11, 2021, "Meyah Meyah" messaged PRESTON "Well text my phone tf" and then provided the **Target Telephone** number. I also observed that on April 7, 2021, the user of the "Meyah Meyah" Facebook account provided the **Target Telephone** number to Quaymar SUGGS as their contact number.  Based on the above, I believe that CARMICHAEL is, in fact, the user of Facebook account # 100055607201122, username "Meyah Meyah" currently "Lakeisha Savage."

88.     I also observed a number of Facebook messages that lead me to believe that Carmichael uses Facebook on the **Target Telephone**.  On May 4, 2021, she messages PRESTON to have her Facetime her.  I know that this is a video or audio call exclusively used between Apple

products such as iPhones and iPads.  At other times she suggested that PHILLIPS could Facetime her or asked STEVENSON if he was going to call her via Facetime or Zoom.  Carmichael's request to utilize Facetime leads me to believe that the **Target Telephone** is an iPhone, is it has an associated telephone number and can utilize Facetime, which generally occurs over cellular data, as opposed to the traditional 2G cellular service that is used for calls and text messages.

89.     While the total number of obtained Facebook messages to or from Carmichael in the executed warrant returns is limited at approximately 240, I have observed references to criminal activity within the messages.  On February 23, 2021, Carmichael messages PRESTON "Wya" ("where you at" – meaning where are you?) and then "Come to the QGs."  PRESTON responds, "Can't do that To many detectives."  Carmichael responds, "Oh we all out here."  In this conversation, I believe that Carmichael is inviting PRESTON to come to the Quinnipiac Gardens housing complex, which is located on Quinnipiac Avenue near Foxon Boulevard in the heart of Exit 8 territory.  PRESTON indicates that he won't come as he believes that there will likely be a law enforcement presence.  I am not aware of PRESTON being wanted by law enforcement at that time and interpret his desire to stay away from a group gathering in the heart of Exit 8's territory as a general precaution due to his frequent gang activity.  I believe that when Carmichael states "we" are there, she is referring to other Exit 8 gang members and associates, as she did not specify any names or identify any group.

90.     I further know that, when Carmichael sent the messages to PRESTON, she almost certainly did so from the **Target Telephone**, as she does not reside within or near Quinnipiac Gardens.

91.     On April 16, 2021, Devin SUGGS and Carmichael had the following Facebook Messenger conversation:

| D. SUGGS: | Where the juggs 😭 😭 |
|---|---|
| CARMICHAEL: | Grand Ave |
| CARMICHAEL: | by crown |
| CARMICHAEL: | Ctown* |
| D. SUGGS: | Now them niggas wanna be on grand 😭 🙈 ☝️ they bouta be happy when I come |
| CARMICHAEL: | No seriously 😭 😭 😭 😩 take them!!! |
| CARMICHAEL: | They actin up |

92.     In the above, Devin SUGGS asked Carmichael where some drug customers (juggs) are. She advised him of a specific location, near the C-Town supermarket on Grand Avenue, in Fairhaven, in or close to the area controlled by the "G" gang members. Devin SUGGS states that the customers will be happy when he comes, which I take to mean that he has quality narcotics. The two then seem to jokingly discuss the demeanor of the possible customers. Devin SUGGS' overt questioning of Carmichael as to where drug customers are located, and Carmichael's apparent easy answer shows that she is, at some level, involved in narcotics trafficking by Exit 8 gang members.

93.     From within the Facebook records, I observed a Facebook Messenger call between STEVENSON and Carmichael on April 26, 2022, furthering my belief that she uses the **Target Telephone** to both access Facebook, including Facebook Messenger, to communicate with Exit 8 gang members.

94.     Based on the records obtained by ATF to date, the last observed use of Facebook messenger by Carmichael was on May 14, 2022, only a few days short of the end of the requested records – May 23, 2022.

95.     As indicated above, the amount of data obtained by law enforcement specifically as it relates to the **Target Telephone** was obtained from a variety of incomplete sources, to include cellular telephones, social media search warrants, call detail records covering various time periods, and a partial review of hundreds of hours of RIVERA'S jail calls.  This being the case, I believe that the **Target Telephone** will contain far more evidence of the target offenses by Carmichael and others, due to the robust nature of data capture within such as device,  compared to present, but piecemeal, interactions others had with Carmichael via the **Target Telephone** via their cellphones, social media accounts, or via telephones as reflected in the CDRs and jail calls.

96.     From my training and experience, I have learned that individuals typically carry their cellular phones on their person so that they can communicate with others.  I know from my training and experience that persons contemplating criminal actions, including thefts and shootings, often use their cellphones around the time of their criminal actions to (1) ascertain where the target location is, and/or (2) to coordinate with coconspirators.  Based on my training and experience, I believe that incidents such as these often involve a third party that acts as a "look out" and/or "get away" driver.  Quite often these individuals communicate via cell phone call and/or text message prior to and at the conclusion of the criminal act.

97.     I also know, based on my training and experience, that new iPhones, when activated, can port into the new iPhone prior information, including photographs, contacts, calendars, social media posts, text messages, and videos, that had been stored on previous iPhones.

98.     Based on my training and experience, as well as the connections between the shootings described above, that it is very likely that the shootings involved multiple perpetrators and/or coconspirators, and that these individuals would have used cellular telephones to communicate with each other.

99.     It is also my belief that the shooting incidents listed above are gang related, which increases the likelihood that the requested authorization will lead to valuable information.  The incidents span across different neighborhoods in the city of New Haven.  I know that it is common for gang members to travel together, often in separate cars, in order to conduct counter surveillance, increase their presence, and to identify rival gang members.  It is common for gang members to drive-by or through a rival gang members area to see if any potential targets are present.  Gang members will communicate what they see through cellular phones via various apps, text messages or phone calls to relay the message.

100.    Based on the above facts and information, there is probable cause to believe that the records described in Attachments A and B would contain evidence of the Subject Offenses.

<u>ELECTRONIC STORAGE AND FORENSIC ANALYSIS</u>

101.    Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.  Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device.  This information can sometimes be recovered with forensics tools.

102.    *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the **Target Telephone** was used, the purpose of its use, who used it, and when.  There is probable cause to believe that this forensic electronic evidence might be on the **Target Telephone** because:

a.      Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b.      Forensic evidence on a device can also indicate who has used or controlled the device.   This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c.      A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.      The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process.   Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.   Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.   Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.      Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

103.    *Nature of examination.*   Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant.   The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

104.    *Manner of execution.*  Because this warrant seeks to obtain the **Target Telephone** from Carmichael within the District of Connecticut, law enforcement plans on seeking a consensual interaction with Carmichael.  At that time, law enforcement would place a call into the **Target Telephone**, or otherwise positively identify the device, prior to any seizure.

## CONCLUSION

105.    I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the **Target Telephone** described in Attachment A to seek the items described in Attachment B.

Respectfully submitted,

MICHAEL OPPENHEIM
Special Agent
Bureau of Alcohol, Tobacco, Firearms & Explosives

Subscribed and sworn before me on October _18th_, 2022, at _1:12_ a.m./p.m. in Bridgeport, Connecticut.

HON. S. DAVE VATTI
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

### Property to Be Searched

The cellular telephone bearing telephone number 475-449-7160 and used by Jameyah Carmichael (the "**Target Telephone**").

## ATTACHMENT B

### Things To Be Seized

All records on the **Target Telephone** described in Attachment A that relate to violations of 18 U.S.C. § 1962(d) (Racketeering Conspiracy); 18 U.S.C. § 1959 (Violent Crimes in Aid of Racketeering); 18 U.S.C. § 922(g) (Possession of a Firearm by a Prohibited Person); 18 U.S.C. § 924(c) (Possession of a Firearm in Furtherance of Drug Trafficking); and 21 U.S.C. §§ 841(a)(1) and 846 (Distribution and Possession with Intent to Distribute Narcotics and Conspiracy to Possess with Intent to Distribute and to Distribute Narcotics) (the "Target Offenses") for April 5, 2021 until the present:

1. The telephone number, ESN number, serial number, SIM card number or any other unique identifying numbers associated with the **Target Telephone**;

2. The numbers, digits, stored messages (voice and/or text), letters, symbols, data, information, and images stored in the memory of the **Target Telephone**;

3. Descriptions of times, dates, locations, items, or events showing or tending to show the commission of, or connecting or tending to connect a person to, the Target Offenses;

4. Any and all records, however created or stored, which tend to demonstrate ownership and use of the **Target Telephone**, and identification bearing the name or photograph of any person, telephone-books, address books, date books, calendars, personal files, and photographs of persons contained in the **Target Telephone**;

5. Any and all evidence showing or tending to show the identity of the maker or user of the data and information contained in the **Target Telephone**, such as passwords, sign-on codes, and program design; GPS coordinates, waypoints, destinations, addresses, and location search parameters associated with GPS navigation software;

6. Saved searches, locations, and route history in the memory of the **Target Telephone**;

7. Images and videos in the memory of the **Target Telephone**;

8. Evidence of user attribution showing who used or owned the **Target Telephone** at the time the things described in this affidavit were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

9. Any conversations on applications downloaded onto the **Target Telephone**, including social media and text message applications, including but not limited to iMessage, Facebook messenger, Snapchat, and other similar social media platforms.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form. It is specifically authorized that stored electronic information, data, information and images contained in the above-described subject devices may be reproduced by printing said stored electronic information or otherwise reproducing said stored electronic information, by converting said stored electronic information, or by copying said stored electronic information into storage in another device.